James E. Magleby (7247)
  magleby@mcpc.law
Jennifer Fraser Parrish (11207)
  parrish@mcpc.law
**MAGLEBY CATAXINOS, PC**
141 West Pierpont Avenue
Salt Lake City, Utah 84101
Tel.: (801) 359-9000
Fax: (801) 359-9011

Liaison Counsel

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **JEFFREY ALONZO MINTER, KYLE GANNON, LATISE SAVOY, KEEBA COUCIL, RAYMOND DELGADO SANDOVAL, KIMBERLY DUKES,** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**FINWISE BANK, FINWISE BANCORP, and AMERICAN FIRST FINANCE,**<br><br>Defendants. | **CONSOLIDATED CLASS ACTION COMPLAINT**<br>**(Jury Trial Demanded)**<br><br>**Case No. 2:25-cv-00569-JNP-CMR**<br><br>**Judge Jill N. Parrish**<br>**Magistrate Judge Cecilia M. Romero** |

Plaintiffs Jeffrey Alonzo Minter, Kyle Gannon, Latise Savoy, Keeba Coucil, Raymond

Delgado Sandoval and Kimberly Dukes ("Plaintiffs"), individually and on behalf of all similarly

situated persons, allege the following against FinWise Bank and FinWise Bancorp ("FinWise")

and American First Finance ("AFF") (together "Defendants"), based upon personal knowledge

1

with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## <u>INTRODUCTION</u>

1.      Entities that provide services and handle customers' and employees' sensitive personal identifiable information (defined below) owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII to unauthorized persons—especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private financial matters.

2.      Plaintiffs bring this class action against Defendants for their failure to properly secure and safeguard personal identifiable information ("PII" or "Private Information")[1] of potentially several hundred thousand individuals, including, but not limited to, name, date of birth, federal/state identification numbers, tax identification number, social security number and/or financial account information, and other information such as phone number, address, and email address.

3.      On July 29, 2025, FinWise announced that it "experienced a data security incident involving a former employee who accessed FinWise data after the end of their employment."[2]

4.      According to FinWise the breach occurred on or about May 31, 2024 (the "Data Breach"), however, FinWise delayed over 14 months to provide any notice to those affected by the Data Breach, including Plaintiffs and Class members.

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2] *See* Breach Notice, attached as Exhibit "A."

5. According to the Breach Notice:

"[s]ome of the data impacted includes American First Finance's ("AFF's") data. FinWise contracts with AFF to offer installment loans to consumers. In this arrangement, FinWise is the lender and AFF is the technology provider. FinWise originates the loan and provides funds to the consumer. AFF is contracted to provide the application platform, facilitate the loan origination for FinWise, as well as service the loan on behalf of FinWise. Please note that you may have had, or applied for, a FinWise installment loan ("bank loan"), a lease-to-own account, or a retail installment sales agreement account with AFF which was impacted by this security incident.[3]

6. The Breach Notice further states that "our extensive forensic investigation and manual document review discovered that certain files containing your personal information may have been accessed or acquired as a result of this incident."[4]

7. Further that the "impacted information contained some of your personal information, specifically, *your full name, Date of Birth, Social Security Number and Account Number.*"[5]

8. Prior to and through May 31, 2024, Defendants obtained the Plaintiffs' and Class members' PII, including by collecting it directly from Plaintiffs and Class Members.

9. Prior to and through May 31, 2024, Defendants stored Plaintiffs' and Class members' PII unencrypted, in an Internet-accessible environment on Defendants' network.

10. On or around July 29, 2025, Defendants began notifying Plaintiffs and Class members of the Data Breach.

11. By obtaining, collecting, using, and deriving a benefit from the Plaintiffs' and Class members' PII, Defendants assumed legal and equitable duties to those individuals to protect

---

[3] *Id.*
[4] *Id.*
[5] *Id.* (emphasis added).

and safeguard that information from unauthorized access and intrusion. Defendants admit that the unencrypted PII that was accessed and/or acquired by an unauthorized actor included name, date of birth, driver's license number, federal/state identification card number, tax identification number, social security number and/or financial account information, and other information such as phone number, address, and email address.

12. The exposed Plaintiffs' and Class members' PII can be sold on the dark web. Hackers can access and then offer for sale the un-encrypted, unredacted PII to criminals. Plaintiffs and Class members now face a lifetime risk of (i) identity theft, which is heightened here by the loss of Social Security numbers, and (ii) the sharing and detrimental use of their sensitive information.

13. The PII was compromised due to Defendants' negligent and/or careless acts and omissions and the failure to protect the Plaintiffs' and Class members' PII. Defendants have also purposefully maintained secret the specific vulnerabilities and root causes of the breach and have not informed Plaintiffs and Class Members of that information.

14. Prior to receiving notification, Plaintiffs and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm, including the sharing and detrimental use of their sensitive information. The risk will remain for their respective lifetimes.

15. Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect the Plaintiffs' and Class members' PII; (ii) warn Plaintiffs and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective

4

security procedures free of vulnerabilities and incidents. Defendants' conduct amounts to negligence and violates federal and state statutes.

16.     Plaintiffs and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the disclosure of their private information, and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

17.     Defendants disregarded Plaintiffs' and Class members' rights by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, Plaintiffs' and Class members' PII were compromised through disclosure to an unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

18.     Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for

negligence, negligence *per se*, breach of implied contract, unjust enrichment, violations of the California Unfair Competition Law, Cal Bus. & Prof. Code § 17200, *et seq.*, violations of the California Consumer Privacy Act of 2018, Cal. Civ. Code § 1798, *et seq.*, and declaratory judgment. The remedies Plaintiffs seek include actual, nominal, and putative damages; appropriate injunctive and declaratory relief; and attorneys' fees, costs, and expenses.

## PARTIES

19. Plaintiff Jeffrey Alonzo Minter is an adult individual and, at all relevant times herein, a resident and citizen of Virginia. Plaintiff is a FinWise customer and a Data Breach victim.

20. Plaintiff Minter received the letter notifying him of the breach, via email, directly from Defendants dated July 29, 2025.

21. Plaintiff Kyle Gannon is, and at all times relevant hereto was, a citizen of the State of California. Plaintiff Gannon is a Data Breach victim.

22. Plaintiff Gannon received the letter notifying him of the breach, via email, directly from Defendants dated July 29, 2025.

23. Plaintiff Latise Savoy is, and at all times mentioned herein was, an individual citizen of the State of South Carolina. Plaintiff Savoy is a Data Breach victim.

24. Plaintiff Keeba Council is an adult individual and, at all relevant times herein, a resident and citizen of Arkansas, residing in Dumas, Arkansas. Plaintiff Council is a Data Breach victim.

25. Plaintiff Council received the letter notifying her of the breach, via regular mail, directly from Defendants dated July 29, 2025.

26. Plaintiff Raymond Delgado Sandoval is an adult individual and, at all relevant times

herein, a resident and citizen of California. Plaintiff Sandoval is a Data Breach victim.

27.    Plaintiff Sandoval received the letter notifying him of the breach, via regular mail, directly from Defendants dated July 29, 2025.

28.    Plaintiff Kimberly Dukes is, and at all times mentioned herein was, an individual citizen of the State of New Jersey. Plaintiff Dukes is a Data Breach victim.

29.    Defendant FinWise Bank is a Utah chartered bank with a principal place of business at 756 E Winchester Suite 100, Murray, Utah, 84107.

30.    Defendant FinWise Bancorp is a Utah Business Corporation and the parent company of FinWise Bank with a principal place of business at 756 E Winchester Suite 100, Murray, Utah, 84107.

31.    According to its website, FinWise provides "'Embedded Banking' [ ] where FinWise helps non-Financial businesses, *i.e.,* fintechs, offer financial products to consumers and businesses."[6] Further, that "[w]e offer lending services today and are adding BIN sponsorship and payments."[7]

32.    Defendant American First Finance is a Delaware limited liability company registered to conduct business in this state with a principal place of business located at 15 West South Temple, Suite 600, Salt Lake City, Utah, 84101.

33.    According to AFF's website, the company was established in 2013 and provides "no-credit-needed payment solutions in all 50 states, plus Washington, D.C., and Puerto Rico."[8]

---

[6] https://investors.finwisebancorp.com/about-us (last visited November 14, 2025).
[7] *Id.*
[8] https://americanfirstfinance.com/about-us/ (last visited November 14, 2025).

34.     As part of its product offerings, AFF provides consumer installment loan,[9] retail installment agreement servicing and lease, lease-to-own, rent-to-own, or rental-purchase services to consumers and third parties, including FinWise.[10]

## JURISDICTION AND VENUE

35.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

36.     This Court has personal jurisdiction over the parties in this case. Defendants conduct business in this District and are citizens of this District by virtue of having principal places of business located in this District.

37.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendants maintain a headquarters in this District and regularly conduct business in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including Defendants collecting and/or storing the Plaintiffs' and Class members' PII.

## FACTUAL ALLEGATIONS

### A. Defendants' Business and Collection of Plaintiffs' and Class Members' Private Information

38.     FinWise is a banking company. Founded in 1999, FinWise was rated the best performing community bank in 2022, 2023, and 2024 by Independent Banker, serving thousands

---

[9] *Id.* Loans are originated by FinWise Bank.
[10] *Id.*

of individual and business customers in across the United States. FinWise employs more than 200 people and generates approximately $69.82 million in annual revenue.

39.    As set forth above, FinWise contracts with AFF to offer installment loans to consumers through which AFF facilitates loan origination and services loans for FinWise.

40.    As a condition of receiving banking and loan services, Defendants require that their customers entrust them with highly sensitive personal information, including Private Information. In the ordinary course of receiving Defendants' services, Plaintiffs and Class Members were required to provide their Private Information.

41.    Defendants collected Plaintiffs' and Class members' PII and stored it, unencrypted, on Defendants' internet-accessible network as part of Defendants' normal business operations.

42.    Plaintiffs and Class members relied on these sophisticated Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members demand security to safeguard their PII.

43.    Defendants had a duty to adopt reasonable measures to protect the Plaintiffs' and Class members' PII from involuntary disclosure to third parties.

44.    Defendants use Plaintiffs' and Class members' PII, *inter alia*, for everyday business purposes and marketing.

45.    In its privacy policy, FinWise promises its customers that it will not share this Private Information with third parties:

> "We recognize, respect and protect the personal privacy rights of all FinWise customers. We realize that you entrust us with personal information, and it is our policy to maintain that information in a confidential manner. We are committed to providing the highest level

of security and privacy regarding the collection and use of your personal information."[11]

46.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

### B.  The Data Breach and Defendants' Inadequate Notice to Plaintiffs and Class Members

47.    According to the Breach Notice, Defendants learned of unauthorized access to Finwise's computer systems on May 31, 2024, with such unauthorized access having taken place on or around the same day.

48.    Through the Data Breach, the unauthorized employee accessed a cache of highly sensitive Private Information, including full names, dates of birth, Social Security numbers, and account numbers of Defendants' customers.

49.    On or about July 29, 2025, roughly fourteen months after FinWise learned that Plaintiffs and Class Members' Private Information was first accessed by a former employee, Defendants finally began to notify customers that their investigation determined that their Private Information was involved.

50.    Defendants delivered Data Breach Notification Letters to Plaintiffs and Class Members, alerting them that their highly sensitive Private Information had been exposed in a "Data Breach."

51.    Omitted from the Notice are crucial details like the root cause of the Data Breach,

---

[11] https://www.finwise.bank/policies-and-agreements/privacy-policy (last visited on Nov. 14, 2025).

the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

52.     Thus, Defendants' purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach was and is severely diminished.

53.     In addition, the Notice offers no substantive steps to help victims like Plaintiffs and Class Members to protect themselves other than providing one (1) year of credit monitoring – an offer that is woefully inadequate considering the lifelong increased risk of fraud and identity theft Plaintiffs and Class Members now face as a result of the Data Breach.

54.     Defendants had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

55.     Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

56.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

57.     Defendants knew or should have known that their electronic records would be targeted.

### C. *Defendants Knew or Should Have Known of the Risk of a Cyber Attack Because Businesses in Possession of Private Information are Particularly Susceptible.*

58.     Defendants' negligence, including their gross negligence, in failing to safeguard Plaintiffs' and Class Members' Private Information is particularly stark, considering the highly public increase of cybercrime similar to the incident that resulted in the Data Breach.

59.     Data thieves regularly target entities like Defendants due to the highly sensitive information they maintain. Defendants knew and understood that Plaintiffs' and Class Members' Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize it through unauthorized access.

60.     According to the Identity Theft Resource Center's 2023 Data Breach Report, the overall number of publicly reported data compromises in 2023 increased more than 72-percent over the previous high-water mark and 78-percent over 2022.[12]

61.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

62.     According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[13] This publication also explains that "[t]he FBI does

---

[12] *2023 Annual Data Breach Report*, IDENTITY THEFT RESOURCE CENTER, (Jan. 2024), *available online at*: https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf (last visited on Nov. 14, 2025).
[13] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited November 14, 2025).

not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[14]

63.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect Plaintiffs' and Class Members' Private Information from being compromised in this Data Breach.

64.    As national service providers in possession of millions of customers' Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information Plaintiffs and Class Members entrusted to Defendants, and of the foreseeable consequences Plaintiffs and Class Members would suffer if Defendants' data security systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to the unauthorized exposure of their Private Information to criminal actors. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach or the foreseeable injuries it caused.

65.    Given the nature of the Data Breach, it was foreseeable that Plaintiffs' and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals, for use in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs' and Class Members' names.

66.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network server(s) and systems and the significant

---

[14] *Id.*

number of individuals who would be harmed by the exposure of the unencrypted data.

67.     Plaintiffs and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information and the critical importance of providing adequate security for that data, particularly due to the highly public trend of data breach incidents in recent years.

### D.  Defendants Failed to Comply with FTC Guidelines

68.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

69.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[15] The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion

---

[15] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (October 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited on Nov. 14, 2025).

detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

70. The FTC further recommends that companies not maintain personally identifiable information ("PII") longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

71. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45 *et seq*. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

72. Such FTC enforcement actions include those against businesses that fail to adequately protect customer data, like Defendants here. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

73. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect Private Information

15

they collect and maintain from consumers. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

74.     The FTC has also recognized that personal data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[16]

75.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

76.     Defendants were at all times fully aware of their obligations to protect the Private Information of its customers yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

E. *Defendants Failed to Comply with Industry Standards*

77.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

78.     The Center for Internet Security's (CIS) Critical Security Controls (CSC)

---

[16] FTC Commissioner Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), *transcript available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited on Nov. 14, 2025).

recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[17]

79.    The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

    a.  Control who logs on to your network and uses your computers and other devices.
    b.  Use security software to protect data.
    c.  Encrypt sensitive data, at rest and in transit.
    d.  Conduct regular backups of data.
    e.  Update security software regularly, automating those updates if possible.
    f.  Have formal policies for safely disposing of electronic files and old devices.
    g.  Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

80.    Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known

---

[17] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list (last visited on Nov. 14, 2025).

exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[18]

81.      Defendants failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

### F. *Defendants Breached Their Duties to Safeguard Plaintiffs' and Class Members' Private Information*

82.      In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being

---

[18] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited Nov. 14, 2025).

compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including complying with industry standards and requirements, training for their staff, and ensuring that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

83.    Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.    Failing to adequately protect customers' Private Information;

    c.    Failing to properly monitor their own data security systems for existing intrusions;

    d.    Failing to sufficiently train their employees regarding the proper handling of their customers Private Information;

    e.    Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

    f.    Failing to adhere to industry standards for cybersecurity as discussed above; and

    g.    Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Private Information.

84.    Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access computer networks and systems which contained unsecured and unencrypted Private Information.

19

85.     Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

86.     Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants.

### G. As a result of the Data Breach, Plaintiffs' and Class Members Are at a Significantly Increased Risk of Fraud and Identity Theft.

87.     The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers, like Plaintiffs and Class Members, suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[19] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

88.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to

---

[19] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* FEDERAL TRADE COMMISSION (Oct. 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Nov. 14, 2025).

monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

89.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

90.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

91.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

92.     One such example of how malicious actors may compile Private Information is

through the development of "Fullz" packages.

93.     Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

94.     The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

95.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a

freeze on their credit, and correcting their credit reports.[20] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

96.    Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

97.    PII is data that can be used to identify a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

98.    The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[21] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendants' industry.

---

[20] *See IdentityTheft.gov,* FEDERAL TRADE COMMISSION, *available at*: https://www.identitytheft.gov/Steps (last visited on Nov. 14, 2025).

[21] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. DEP'T OF JUSTICE (Feb. 10, 2020), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military (last visited on Nov. 14, 2025).

99. The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[22] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for $30 in 2017.[23]

100. Furthermore, even information such as names, email addresses and phone numbers, can have value to a hacker. Beyond things like spamming customers, or launching phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual. It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[24]

101. The Dark Web Price Index of 2023, published by PrivacyAffairs, shows how

---

[22] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs (last visited on November 14, 2025).

[23] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web (last visited on Nov 14, 2025).

[24] *See Dark Web Price Index: The Cost of Email Data,* MAGICSPAM, https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/ (last visited on November 14, 2025).

valuable just email addresses alone can be, even when not associated with a financial account:[25]

| Email Database Dumps | Avg. Price USD (2022) |
|---|---|
| 10,000,000 USA email addresses | $120 |
| 600,000 New Zealand email addresses | $110 |
| 2,400,000 million Canada email addresses | $100 |

102.    Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails. If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

103.    Likewise, the value of PII is increasingly evident in our digital economy. Many companies, including Defendants, collect PII for purposes of data analytics and marketing. These companies, collect it to better target customers, and share it with third parties for similar purposes.[26]

104.    One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[27]

105.    Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather by the economic benefit consumers derive

---

[25] *See Dark Web Price Index 2023*, PRIVACY AFFAIRS, https://www.privacyaffairs.com/dark-web-price-index-2023/ (last visited on November 14, 2025).

[26] *See Privacy Policy*, ROBINHOOD, https://robinhood.com/us/en/support/articles/privacy-policy/ (last visited on November 14, 2025).

[27] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

from being able to use it and control the use of it.

106.    A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user. In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

107.    Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiffs' PII impairs their ability to participate in the economic marketplace.

108.    The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[28] After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:

- 77-percent experienced financial-related problems;
- 29-percent experienced financial losses exceeding $10,000;
- 40-percent were unable to pay bills;
- 28-percent were turned down for credit or loans;
- 37-percent became indebted;
- 87-percent experienced feelings of anxiety;
- 67-percent experienced difficulty sleeping; and
- 51-percent suffered from panic of anxiety attacks.[29]

109.    It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information

---

[28] *2023 Consumer Impact Report* (Jan. 2024), IDENTITY THEFT RESOURCE CENTER, *available online at*: https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf (last visited on Nov. 14, 2025).

[29] *Id* at pp 21-25.

is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[30]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

110.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

111.    As a result, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

## PLAINTIFFS' AND CLASS MEMBERS' DAMAGES

### *Plaintiff Jeffrey Alonzo Minter's Experience*

112.    Plaintiff Jeffrey Alonzo Minter maintained personal banking accounts or obtained loans or other services from Defendants or their affiliates prior to the Data Breach and received Defendants' Notice of Data Breach, dated July 29, 2025, on or about that date.

113.    As a result of the Data Breach, Plaintiff's sensitive information was accessed and/or acquired by an unauthorized actor. The confidentiality of Plaintiff's sensitive information has been irreparably harmed. For the rest of his life, Plaintiff will have to worry about when and how his sensitive information may be shared or used to his detriment.

---

[30] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited on Nov. 14, 2025).

114.    As a result of the Data Breach notice, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

115.    Plaintiff Minter has experienced fraudulent charges (or attempted charges) on his credit cards, debit cards, or bank accounts. Unknown third parties have attempted to open bank accounts and loans in his name. Despite his best efforts, Plaintiff has suffered numerous occurrences of fraudulent activity using his personal information that was taken from Defendants.

116.    Since the Data Breach, Plaintiff Minter has tried to mitigate the damage by changing his passwords, contacting the credit bureaus, and monitoring his financial accounts for and spent several hours on these activities. This is more time than he spent prior to learning of the Defendants' Data Breach. Having to do this every week not only wastes his time as a result of Defendants' negligence, but it also causes him great anxiety.

117.    Soon after the Data Breach, Plaintiff Minter began receiving an excessive number of spam calls on the same cell phone number provided to Defendants on his records. These calls are a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that the calls are related to his stolen PII.

118.    Additionally, Plaintiff is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

119.    Plaintiff stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

120. Defendants' data security shortcomings resulted in the Data Breach and caused Plaintiff significant injuries and harm in several ways. For example, Plaintiff has devoted and will continue to devote significant time, energy, and money to: closely monitoring his bills, records, and credit and financial accounts; changing login and password information on any sensitive account; carefully screening and scrutinizing phone calls, emails, and other communications to ensure that he is not being targeted by identity theft scams, medical identity theft scams, or other attempts at fraud; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect himself; and placing fraud alerts and/or credit freezes on their credit file. Plaintiff has taken or will be forced to take these measures to mitigate his potential damages because of the Data Breach.

121. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

122. Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

123. Plaintiff Minter is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendants' Data Breach.

124. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff suffered lost time, annoyance,

interference, and inconvenience because of the Data Breach.

125.    Plaintiff has experienced anxiety and increased concerns arising from the fact that his PII has been or will be misused and from the loss of his privacy.

126.    The risk is not hypothetical. Here, a known hacker intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive information, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

127.    Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII, a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and because of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

128.    Plaintiff has a continuing interest in ensuring that his PII which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

129.    Had Plaintiff Minter been aware that Defendants' computer systems were not secure, he would not have entrusted Defendants with his PII and PHI.

***Plaintiff Kyle Gannon's Experience***

130.    Plaintiff Kyle Gannon is a former FinWise customer who obtained loans from Defendants in 2019 and 2021. On each occasion of applying for and obtaining a loan, he was required to provide extensive personal and financial information as a condition of receiving the loan.

131.    As a condition of obtaining services from Defendants, he was required to provide

30

his PII to Defendants. Defendants maintained Plaintiff's PII in its systems at the time of the Data Breach.

132.    On or about July 29, 2025, Plaintiff received a Data Breach notification from Defendants, stating that his PII including his full name, date of birth, Social Security Number and account number, may have been accessed or acquired as a result of this cyber incident.

133.    Plaintiff is very careful about sharing his sensitive PII. He stores any documents containing PII in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

134.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

135.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to

his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII.

136.    Plaintiff additionally suffered actual injury in the form of his PII being disseminated, on information and belief, on the dark web as a result of the Data Breach.

137.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

135. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

138.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches

### *Plaintiff Latise Savoy's Experience*

139.    Plaintiff Savoy is a FinWise customer.

140.    When Plaintiff Savoy first became a customer, Defendants required that she provide it with substantial amounts of her PII.

141.    On or about July 29, 2025, Plaintiff Savoy received the Notice informing her that her Private Information had been accessed or acquired during the Data Breach. The Notice provided that the Private Information compromised included her "full name, Social Security Number and Account Number."

142.    The Notice offered Plaintiff Savoy only one year of credit monitoring services. One

year of credit monitoring is not sufficient given that Plaintiff Savoy will now experience a lifetime of increased risk of identity theft and other forms of targeted fraudulent misuse of her Private Information.

143.    Plaintiff Savoy suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud. To date, Plaintiff Savoy has spent an estimated 26 hours researching the Data Breach and checking accounts, as well as changing her Venmo login information several times.

144.    Plaintiff Savoy would not have provided her Private Information to Defendants had Defendants timely disclosed that its systems lacked adequate computer and data security practices to safeguard its customers' personal information from theft, and that those systems were subject to a data breach.

145.    Plaintiff Savoy suffered actual injury in the form of actual misuse of her Private Information when last year an unauthorized third-party opened two savings accounts in her name with American Express in June of 2024.

146.    Plaintiff Savoy suffered actual injury in the form of having her Private Information compromised and/or stolen as a result of the Data Breach.

147.    Plaintiff Savoy suffered actual injury in the form of damages to and diminution in the value of her personal and financial information – a form of intangible property that Plaintiff Savoy entrusted to Defendants for the purpose of receiving banking services from Defendants and which was compromised in, and as a result of, the Data Breach.

148.    Plaintiff Savoy suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private

33

Information being placed in the hands of criminals.

149.    Plaintiff Savoy has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendants, is protected and safeguarded from future breaches. This interest is particularly acute, as Defendants' systems have already been shown to be susceptible to compromise and are subject to further attack so long as Defendants fails to undertake the necessary and appropriate security and training measures to protect its customers' Private Information.

150.    As a result of the Data Breach, Plaintiff Savoy made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendants, as well as long-term credit monitoring options she will now need to use. Plaintiff Savoy has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

151.    As a result of the Data Breach, Plaintiff Savoy has suffered anxiety as a result of the release of her Private Information to cybercriminals, which Private Information she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against her. Plaintiff Savoy is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on her life.

152.    Plaintiff Savoy also suffered actual injury as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that

Defendants obtained from Plaintiff Savoy; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

153.    As a result of the Data Breach, Plaintiff Savoy anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

### Plaintiff Keeba Council's Experience

154.    Plaintiff Keeba Council maintained personal banking accounts or obtained loans or other services from Defendants or its affiliate prior to the Data Breach and received Defendants' Notice of Data Breach, dated July 29, 2025, on or about that date.

155.    As a result of the Data Breach, Plaintiff Council's sensitive information was accessed and/or acquired by an unauthorized actor.  The confidentiality of Plaintiff Council's sensitive information has been irreparably harmed. For the rest of her life, Plaintiff Council will have to worry about when and how her sensitive information may be shared or used to her detriment.

156.    As a result of the Data Breach notice, Plaintiff Council spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

157.    Since the Data Breach, Plaintiff Council has tried to mitigate the damage by changing her passwords, contacting the credit bureaus, and monitoring her financial accounts for and spent several hours on these activities. This is more time than she spent prior to learning of

the Defendants' Data Breach. Having to do this every week not only wastes her time as a result of Defendants' negligence, but it also causes her great anxiety.

158. Soon after the Data Breach, Plaintiff Council began receiving an excessive number of spam calls on the same cell phone number provided to Defendants on her records. These calls are a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that the calls are related to his stolen PII.

159. Additionally, Plaintiff Council is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

160. Plaintiff Council stores any documents containing her sensitive PII in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

161. Defendants' data security shortcomings resulted in the Data Breach and caused Plaintiff Council significant injuries and harm in several ways. For example, Plaintiff Council has devoted and will continue to devote significant time, energy, and money to: closely monitoring her bills, records, and credit and financial accounts; changing login and password information on any sensitive account; carefully screening and scrutinizing phone calls, emails, and other communications to ensure that she is not being targeted by identity theft scams, medical identity theft scams, or other attempts at fraud; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect himself; and placing fraud alerts and/or credit freezes on their credit file. Plaintiff Council has taken or will be forced to take these measures to mitigate her potential damages because of the Data Breach.

162.    Plaintiff Council has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

163.    Plaintiff Council has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

164.    Plaintiff Council is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendants' Data Breach.

165.    Plaintiff Council has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff Council suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

166.    Plaintiff Council has experienced anxiety and increased concerns arising from the fact that her PII has been or will be misused and from the loss of her privacy.

167.    The risk is not hypothetical. Here, a known hacker intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive information, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

168.    Plaintiff Council suffered further injury in the form of damages to and diminution in the value of Plaintiff Council's PII, a form of intangible property that Plaintiff Council entrusted to Defendants, which was compromised in and because of the Data Breach. Future identity theft

monitoring is reasonable and necessary, and such will include future costs and expenses.

169.    Plaintiff Council has a continuing interest in ensuring that her PII which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

170.    Had Plaintiff Council been aware that Defendants' computer systems were not secure, she would not have entrusted Defendants with his PII and PHI.

### *Plaintiff Raymond Delgado Sandoval's Experience*

171.    Plaintiff Sandoval maintained personal banking accounts or obtained loans or other services from Defendants or its affiliate prior to the Data Breach and received Defendants' Notice of Data Breach, dated July 29, 2025, on or about that date.

172.    As a result of the Data Breach, Plaintiff Sandoval's sensitive information was accessed and/or acquired by an unauthorized actor.  The confidentiality of Plaintiff Sandoval's sensitive information has been irreparably harmed. For the rest of his life, Plaintiff Council will have to worry about when and how his sensitive information may be shared or used to his detriment.

173.    As a result of the Data Breach notice, Plaintiff Sandoval spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

174.    Since the Data Breach, Plaintiff Sandoval has tried to mitigate the damage by changing his passwords, contacting the credit bureaus, and monitoring his financial accounts for and spent several hours on these activities. This is more time than he spent prior to learning of the

Defendants' Data Breach. Having to do this every week not only wastes his time as a result of Defendants' negligence, but it also causes him great anxiety. Further, due to the volume of spam and phishing emails he was receiving, he obtained new email address.

175.    Soon after the Data Breach, Plaintiff Sandoval began receiving an excessive number of spam calls on the same cell phone number provided to Defendants on his records. These calls are a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that the calls are related to his stolen PII.

176.    Since the Data Breach, Plaintiff Sandoval has become aware that an unknown third party attempted on several occasions to withdraw funds from his bank account. He had to have his debit card replaced.

177.    Additionally, Plaintiff Sandoval is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

178.    Plaintiff Sandoval stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

179.    Defendants' data security shortcomings resulted in the Data Breach and caused Plaintiff Sandoval significant injuries and harm in several ways. For example, Plaintiff Sandoval has devoted and will continue to devote significant time, energy, and money to: closely monitoring his bills, records, and credit and financial accounts; changing login and password information on any sensitive account; carefully screening and scrutinizing phone calls, emails, and other communications to ensure that he is not being targeted by identity theft scams, medical identity

theft scams, or other attempts at fraud; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect himself; and placing fraud alerts and/or credit freezes on their credit file. Plaintiff Sandoval has taken or will be forced to take these measures to mitigate his potential damages because of the Data Breach.

180.   Plaintiff Sandoval has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

181.   Plaintiff Sandoval has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

182.   Plaintiff Sandoval is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendants' Data Breach.

183.   Plaintiff Sandoval has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff Sandoval suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

184.   Plaintiff Sandoval has experienced anxiety and increased concerns arising from the fact that his PII has been or will be misused and from the loss of his privacy.

185.   The risk is not hypothetical. Here, a known hacker intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive information, including names and Social Security numbers, is the type that could be used to

perpetrate identity theft or fraud.

186.    Plaintiff Sandoval suffered further injury in the form of damages to and diminution in the value of Plaintiff Sandoval's PII, a form of intangible property that Plaintiff Sandoval entrusted to Defendants, which was compromised in and because of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

187.    Plaintiff Sandoval has a continuing interest in ensuring that his PII which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

188.    Had Plaintiff Sandoval been aware that Defendants' computer systems were not secure, he would not have entrusted Defendants with his PII and PHI.

### Plaintiff Kimberly Duke's Experience

189.    Plaintiff Dukes is a FinWise customer.

190.    When Plaintiff Dukes first became a customer, Defendants required that she provide it with substantial amounts of her PII.

191.    On or about July 29, 2025, Plaintiff Dukes received the Notice informing her that her Private Information had been accessed or acquired during the Data Breach. The Notice provided that the Private Information compromised included her "address, phone number, Social Security Number."

192.    The Notice offered Plaintiff Dukes only one year of credit monitoring services. One year of credit monitoring is not sufficient given that Plaintiff Dukes will now experience a lifetime of increased risk of identity theft and other forms of targeted fraudulent misuse of her Private

Information.

193.    Plaintiff Dukes suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

194.    Plaintiff Dukes suffered actual injury in the form of fraudulent misuse of her Private Information. An unauthorized actor made a fraudulent $1,200 purchase from Verizon in her name in June 2024, and it is still on her credit report as of November 2025.

195.    Plaintiff Dukes would not have provided her Private Information to Defendants had Defendants timely disclosed that its systems lacked adequate computer and data security practices to safeguard its customers' personal information from theft, and that those systems were subject to a data breach.

196.    Plaintiff Dukes suffered actual injury in the form of having her Private Information compromised and/or stolen as a result of the Data Breach.

197.    Plaintiff Dukes suffered actual injury in the form of damages to and diminution in the value of her personal and financial information – a form of intangible property that Plaintiff Dukes entrusted to Defendants for the purpose of receiving banking services from Defendants and which was compromised in, and as a result of, the Data Breach.

198.    Plaintiff Dukes suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

199.    Plaintiff Dukes has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendants, is protected and safeguarded from future breaches.

This interest is particularly acute, as Defendants' systems have already been shown to be susceptible to compromise and are subject to further attack so long as Defendants fails to undertake the necessary and appropriate security and training measures to protect its customers' Private Information.

200.    As a result of the Data Breach, Plaintiff Dukes made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendants, as well as long-term credit monitoring options she will now need to use. Plaintiff Dukes has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

201.    As a result of the Data Breach, Plaintiff Dukes has suffered anxiety as a result of the release of her Private Information to cybercriminals, which Private Information she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against her. Plaintiff Dukes is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on her life.

202.    Plaintiff Dukes also suffered actual injury as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that Defendants obtained from Plaintiff Dukes; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

203.    As a result of the Data Breach, Plaintiff Dukes anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

### Plaintiffs' and Class Members' Common Injuries

204.    In sum, Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

205.    Plaintiffs and Class Members entrusted their Private Information to Defendants in order to receive Defendants' services.

206.    Plaintiffs' Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendants' inadequate data security practices.

207.    As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

208.    Further, as a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been forced to spend time dealing with the effects of the Data Breach.

209.    Plaintiffs and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiffs and Class Members.

210. The Private Information maintained by and stolen from Defendants' systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiffs and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiffs and Class Members.

211. Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants. Plaintiffs and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiffs and Class Members paid to Defendants was intended to be used by Defendants to fund adequate security of Defendants' system and protect Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and the Class did not receive what they paid for.

212. Additionally, as a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

213. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

214. Additionally, Plaintiffs and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate

marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[31] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[32]

215.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiffs and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiffs and the Class Members, thereby causing additional loss of value.

216.    Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. The contractual bargain entered into between Plaintiffs and Defendants included Defendants' contractual obligation to provide adequate data security, which Defendants failed to provide. Thus, Plaintiffs and Class Members did not get what they bargained for.

217.    Finally, Plaintiffs and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. These losses include, but are not limited to, the following:

---

[31] *See How Data Brokers Profit from the Data We Create*, THE QUANTUM RECORD, https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/ (last visited on November 14, 2025).

[32] *Frequently Asked Questions,* NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited on November 14, 2025).

a. Monitoring for and discovering fraudulent charges;

b. Addressing their inability to withdraw funds linked to compromised accounts;

c. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

d. Contacting financial institutions and closing or modifying financial accounts; and

e. Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

218. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to still be in Defendants' possession, is protected from future additional breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

219. As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

**CLASS ACTION ALLEGATIONS**

220. Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

221. Specifically, Plaintiffs propose the following Nationwide Class, as well as the following State Subclass definitions (also collectively referred to herein as the "Class"), subject to

amendment as appropriate:

### Nationwide Class

All individuals in the United States who had Private Information impacted as a result of the Data Breach, including all who were sent a notice of the Data Breach.

### California Subclass

All residents of California who had Private Information impacted as a result of the Data Breach, including all who were sent a notice of the Data Breach.

222.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which a Defendant has a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

223.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Nationwide Class, as well as the California Subclass, before the Court determines whether certification is appropriate.

224.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

225.    **Numerosity.** The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of thousands of Defendants' customers whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

226.    **Commonality.** There are questions of law and fact common to the Class which

predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants' conduct violated the California Unfair Competition Law (Cal Bus. & Prof. Code § 17200, *et seq.*) and the California Consumer Privacy Act of 2018 (Cal. Civ. Code § 1798, *et seq.*) invoked below;

c. When Defendants learned of the Data Breach;

d. Whether Defendants' response to the Data Breach was adequate;

e. Whether Defendants unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

f. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether Defendants owed a duty to Class Members to safeguard their Private Information;

j. Whether Defendants breached their duties to Class Members to safeguard their Private Information;

k. Whether hackers obtained Class Members' Private Information via the Data

Breach;

l.  Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

m.  Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n.  Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

o.  What damages Plaintiffs and Class Members suffered as a result of Defendants' misconduct;

p.  Whether Defendants' conduct was negligent;

q.  Whether Defendants' conduct was *per se* negligent;

r.  Whether Defendants were unjustly enriched;

s.  Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

t.  Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

u.  Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

227.  **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

228. **<u>Adequacy of Representation</u>.** Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

229. **<u>Predominance</u>.** Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

230. **<u>Superiority</u>.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

231. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final

injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

232. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

**CLAIMS FOR RELIEF**
**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(On behalf of Plaintiffs and the Nationwide Class)**

233. Plaintiffs restate and reallege all of the allegations stated above and hereafter as if fully set forth herein.

234. Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

235. Defendants' duty also included a responsibility to implement processes by which they could detect and analyze a breach of their security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

236. Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

237. Defendants owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. Defendants' duties included, but were not limited to, the following:

52

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect customers' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to the FTCA, the California Unfair Competition Law ("UCL"), and the California Consumer Privacy Act of 2018 ("CCPA").

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

238. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

239. Defendants' duty also arose because Defendants were bound by industry standards to protect customers' confidential Private Information.

240. Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them

to an unreasonable risk of harm.

241.   Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendants' possession.

242.   Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

243.   Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

244.   Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.   Failing to adequately monitor the security of networks and systems;

c.   Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d.   Allowing unauthorized access to Class Members' Private Information;

e.   Failing to comply with the FTCA;

f.   Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g.   Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

245.   Defendants acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

246.   Defendants had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions. Moreover, only Defendants had the ability to protect their systems (and the Private Information stored on them) from attack.

247.   Defendants' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

248.   Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

249.   As a result of Defendants' negligence in breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

250.   Defendants also had independent duties under state laws that required them to

55

reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

251. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

252. The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

253. Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

254. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

<u>**SECOND CAUSE OF ACTION**</u>
**NEGLIGENCE *PER SE***
**(On behalf of Plaintiffs and the Nationwide Class)**

255. Plaintiffs restate and reallege all of the allegations stated above and hereafter as if fully set forth herein.

256. Pursuant to Section 5 of the FTCA, Defendants had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

257. Defendants breached their duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure

56

destruction of unnecessary data, and penetration testing.

258. Plaintiffs and Class Members are within the class of persons that the FTCA is intended to protect.

259. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendants' duty in this regard.

260. Defendants violated the FTCA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

261. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendants' networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

262. Defendants' violations of the FTCA constitute negligence *per se*.

263. Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to Defendants' negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

264. As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized

access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

265.    Defendants breached their duties to Plaintiffs and the Class under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

266.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

267.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class)**

268.    Plaintiffs restate and reallege all of the allegations stated above and hereafter as if fully set forth herein.

269.    Defendants provide banking and loan services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendants regarding the provision of those services through their collective conduct, including by Plaintiffs and Class Members paying for services from Defendants.

270.    Through Defendants' offering of banking services, they knew or should have known that they must protect Plaintiffs' and Class Members' confidential Private Information in

accordance with Defendants' policies, practices, and applicable law.

271. As consideration, Plaintiffs and Class Members paid money to Defendants and turned over valuable Private Information to Defendants. Accordingly, Plaintiffs and Class Members bargained with Defendants to securely maintain and store their Private Information.

272. Defendants accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing banking services to Plaintiffs and Class Members.

273. In delivering their Private Information to Defendants and paying for banking services, Plaintiffs and Class Members intended and understood that Defendants would adequately safeguard the Private Information as part of that service.

274. Defendants' implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of their employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

275. Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

276. Had Defendants disclosed to Plaintiffs and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members

would not have provided their Private Information to Defendants.

277. Defendants recognized that Plaintiffs' and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiffs and the other Class Members.

278. Defendants violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information.

279. Plaintiffs and Class Members have been damaged by Defendants' conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
**(On behalf of Plaintiffs and the Nationwide Class)**

280. Plaintiffs restate and reallege all of the allegations stated above and hereafter as if fully set forth herein.

281. This Count is pleaded in the alternative to Count III above.

282. Plaintiffs and Class Members conferred a benefit on Defendants by turning over their Private Information to Defendants and by paying for banking services that should have included cybersecurity protection to protect their Private Information. Plaintiffs and Class Members did not receive such protection.

283. Upon information and belief, Defendants funds their data security measures entirely from general revenue, including from payments made to them by Plaintiffs and Class Members.

284. As such, a portion of the payments made by Plaintiffs and Class Members is to be

60

used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

285. Defendants have retained the benefits of their unlawful conduct, including the amounts of payment received from Plaintiffs and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

286. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

287. If Plaintiffs and Class Members had known that Defendants had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendants.

288. Due to Defendants' conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of its wrongful conduct.

289. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity

addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

290.   Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

291.   Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**FIFTH CASUE OF ACTION**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")**
**UNLAWFUL BUSINESS PRACTICE**
**(Cal. Bus. & Prof. Code § 17200, *et seq*.)**
**(On behalf of Plaintiffs Gannon and Sandoval and the California Subclass)**

292.   Plaintiffs Gannon and Sandoval ("Plaintiffs" for the purposes of this count) restate and reallege the preceding factual allegations set forth above as if fully alleged herein and bring this claim individually and on behalf of the proposed California Subclass.

293. By reason of the conduct alleged herein, Defendants engaged in unfair and unlawful "business practices" within the meaning the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq*.

294. Defendants stored Plaintiffs' and the Class Members PII in their computer systems and knew or should have known they did not employ reasonable, industry standard, and appropriate security measures that complied with federal regulations and that would have kept Plaintiffs' and the Class Members' PII secure and prevented the loss or misuse of that PII.

295. Plaintiffs and Class Members were entitled to assume, and did assume, that Defendants would take appropriate measures to keep their PII safe.

296. Defendants did not disclose at any time that Plaintiffs 's PII was vulnerable to unauthorized individuals because Defendants' data security measures were inadequate and outdated, and Defendants were the only entites in possession of that material information, which they had a duty to disclose.

297. Defendants violated the UCL by failing to maintain the safety of their computer systems, specifically the security thereof, and its ability to safely store Plaintiffs' and Class Members' PII.

298. Defendants violated the UCL by failing to implement reasonable and appropriate security measures or follow industry standards for data security, failing to comply with their own posted privacy policies, and by failing to immediately timely and adequately notify Plaintiffs and Class Members of the Data Breach.

299. Section 5 of the FTC Act required Defendants to take reasonable measures to protect Plaintiffs' and the Class Members' PII data and is a further source of Defendants' duty to

Plaintiffs and the Class Members.

300.    Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to implement and use reasonable measures to protect Sensitive Information. Defendants, therefore, were required and obligated to take reasonable measures to protect PII they solicited, possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendants' duty to adequately protect Sensitive Information. By failing to implement and use reasonable data security measures, Defendants acted in violation of § 5 of the FTC Act.

301.    Defendants' acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, *inter alia*, Section 5(a) of the FTC Act and the CCPA.

302.    Defendants' conduct also undermines California public policy reflected in statutes such as the California Information Practices Act, Cal. Civ. Code §§ 1798, *et seq*., California Consumer Privacy Act of 2018 Cal. Civ. Code § 1798, *et seq*. ("CCPA") concerning consumer privacy, and California Customer Records Act, Cal. Civ. Code §§ 1798.80 *et seq*. ("CCRA") concerning customer records, which seek to protect customers and consumers' data and ensure that entities like Defendants who solicit or are entrusted with personal data, including PII, utilize reasonable security measures.

303.    If Defendants had complied with these legal requirements, Plaintiffs and Class Members would not have suffered the damages related to the Data Breach, and consequently from, Defendants' failure to timely notify Plaintiffs and the Class Members of the Data Breach.

304.    Moreover, Defendants' collection of sensitive consumers' PII in combination with

their failure to implement reasonable security safeguards demonstrate Defendants' violation of the unfair prong of the UCL.

305.    Defendants violated the unfair prong of the UCL by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Class Members' PII with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and Class Members' PII in an unsecure electronic environment. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members. Defendants' conduct and business practices were likely to deceive the public into believing their PII was securely stored when it was not. The harm these practices caused to Plaintiffs and Class Members outweighed their utility, if any. Further, the gravity of Defendants' conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendants' legitimate business interests, other than Defendants' conduct described herein.

306.    Plaintiffs and Class Members have lost money and property as a result of Defendants' violations of the UCL as they were denied the benefit of their transacting with Defendants because Defendants failed to use funds from money paid by Plaintiffs and Class Members to supply adequate data security.

307.    Moreover, Plaintiffs and Class Members provided their PII to Defendants, which is property as defined by the UCL, and their property has been diminished in value as a result of the loss of its confidentiality.

308.    Plaintiffs and Class Members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) invasion of

privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

309.   Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct and more data breaches will occur.

310.   As such, Plaintiffs Gannon and Sandoval, on their own behalf and on behalf of California Subclass Members, seek restitution and an injunction, including public injunctive relief prohibiting Defendants from continuing such wrongful conduct, and requiring Defendants to modify their corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the Private Information entrusted to them, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

311.   To the extent any of these remedies are equitable, Plaintiffs  and the California Subclass seek such equitable remedies, in the alternative to any adequate remedy at law they may have.

**SIXTH CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT OF 2018**
**("CCPA")**
**Cal. Civ. Code § 1798, *et seq*.**
**(On behalf of Plaintiffs Gannon and Sandoval and the California Subclass)**

312.    Plaintiffs Gannon and Sandoval ("Plaintiffs" for the purposes of this count) restate and reallege the preceding factual allegations set forth above as if fully alleged herein and bring this claim individually and on behalf of the proposed California Subclass.

313.    As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect Private Information from unauthorized access and disclosure.

314.    The California Legislature explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."[33]

315.    As a result, in 2018, the California Legislature passed the CCPA, giving consumers broad protection and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected.

---

[33] California Consumer Privacy Act (CCPA) Compliance,
https://buyergenomics.com/ccpacomplience/

67

316. Defendants failed to implement such procedures which resulted in the Data Breach.

317. CCPA also requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 1798.81.5(c).

318. Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

319. Plaintiffs and Class Members are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

320. Defendants each constitute a "business" as defined by Civ. Code § 1798.140(c) because Defendants:

    a. are each a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners;"

b. "collect[] consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information;"

c. do business in California; and

d. have annual gross revenues in excess of $25 million; annually buy, receive for the business' commercial purposes, sell or share for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices; or derive 50 percent or more of their annual revenues from selling consumers' personal information.

321. The Private Information taken in the Data Breach is personal information as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiffs' and Class members' unencrypted first and last names and Social Security numbers, among other information.

322. Plaintiffs' and Class members' Private Information was subject to unauthorized access and exfiltration, theft, or disclosure because their Private Information, including name and Social Security numbers, was wrongfully taken, accessed, and viewed by unauthorized third parties.

323. The Data Breach occurred as a result of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiffs' and Class members' Private Information. Defendants failed to implement reasonable security procedures to prevent an attack on their server or network, including their email systems, by hackers and to prevent unauthorized access of Plaintiffs' and Class Members' Private Information as a result of this attack.

324.    In accordance with Cal. Civ. Code § 1798.150(b), Plaintiffs Gannon and Sandoval provided Defendants with written notice of its alleged violation of Cal. Civ. Code § 1798.150(a).

325.    Plaintiffs Gannon and Sandoval provided Defendants with written notice of their violations of the CCPA, pursuant to Civil Code § 1798.150(b), mailed on or around August 1, 2025.

326.    At this time, Plaintiffs and California Subclass Members seek only actual pecuniary damages suffered as a result of Defendants' violations of the CCPA, injunctive and declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and any other relief the court deems proper.

### SEVENTH CAUSE OF ACTION
### DECLARATORY JUDGMENT
**(On behalf of Plaintiffs and the Nationwide Class)**

327.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described in this Complaint.

328.    Defendants owe a duty of care to Plaintiffs and Class Members, which required them to adequately secure Plaintiffs' and Class Members' Private Information.

329.    Defendants still possess Private Information regarding Plaintiffs and Class Members.

330.    Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur

in the future.

331.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  Defendants owe a legal duty to secure their customers' Private Information and to timely notify customers of a data breach under the common law and Section 5 of the FTCA;

b.  Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect customers' Private Information; and

c.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure customers' Private Information.

332.    This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect customers' Private Information, including the following:

a.  Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b.  Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

i.    engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and

ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii.      engaging third-party security auditors and internal personnel to run automated security monitoring;

iii.     auditing, testing, and training its security personnel regarding any new or modified procedures;

iv.     segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

v.      conducting regular database scanning and security checks;

vi.     routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.    meaningfully educating its users about the threats they face with regard to the security of their Private Information, as well as the steps Defendants' customers should take to protect themselves.

333.    If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

334.    The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to

Defendants if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants has a pre-existing legal obligation to employ such measures.

335.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Defendants, thus preventing future injury to Plaintiffs and other customers whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Nationwide Class and the California Subclass requested herein;

b. Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.  An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all triable issues.

Dated this 17th day of November, 2025.

Respectfully submitted,
/s/ James E. Magleby
James E. Magleby
MAGLEBY CATAXINOS, PC
141 W Pierpont Ave
Salt Lake City, UT 84101
801-359-9000
Fax: 801-359-9011
Email: magleby@mcpc.law

Liaison Counsel

Marc H. Edelson*
Liberato P. Verderame*
EDELSON LECHTZIN LLP
411 S. State Street, Suite N-300
Newtown, PA 18940
215-867-2399
Fax: 267-685-0676
Email: medelson@edelson-law.com
lverderame@edelson-law.com

Andrew W. Ferich*
AHDOOT & WOLFSON PC
201 King Of Prussia Rd Ste 650
Radnor, PA 19087
310-474-9111
Email: aferich@ahdootwolfson.com

Tyler James Bean*
SIRI & GLIMSTAD LLP
745 Fifth Ave Ste 500
New York, NY 10151
646-357-1732
Fax: 646-417-5967
Email: tbean@sirillp.com

Interim Co-Lead Class Counsel

*Admitted *Pro Hac Vice*